## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| CLEARPOINT BUSINESS RESOURCES, INC., *et al.*,[1] | Case No. 10-_____ |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF CHRISTINE DOELP IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Christine Doelp, hereby state as follow:

1.      I am the President and Secretary of ClearPoint Business Resources, Inc. and ClearPoint Resources, Inc. (collectively, "ClearPoint" or the "Debtors"). I have just been appointed to these positions, as the former President has resigned and Secretary has been terminated. Prior to my current positions, I was the Director of Accounting and Reporting of ClearPoint since 2006.

## I.    The Debtors' Business

2.      ClearPoint Business Resources, Inc. and ClearPoint Resources, Inc. (collectively, "ClearPoint" or the "Debtors") was a provider of staffing services, including the engineering, information technology, aerospace, scientific and transport industries to businesses throughout the United States. ClearPoint Business Resources, Inc. ("CPBR") was formed in Delaware on July 21, 2004. ClearPoint Resources, Inc. ("CPR"), a wholly-owned subsidiary of CPBR, formerly known as Mercer Staffing, Inc. ("Mercer"), was formed in Delaware on January 1, 2005, as a holding company of its

---

[1]      The Debtors, along with the last four digits of their federal tax identification numbers, are: ClearPoint Business Resources, Inc. (4371) and ClearPoint Resources, Inc. (9869). The Debtors' mailing address for purposes of these cases is P.O. Box 3400. Easton, PA. 18045.

wholly-owned subsidiaries consisting of, among others, Mercer Ventures Inc. ("MVI")
and Allied Contract Services, LLC ("Allied"). At that time, the owners of MVI and
Allied exchanged their respective ownership interests for common stock of Mercer.
MVI, a Pennsylvania corporation, has been in existence since 2001. Allied, a
Pennsylvania limited liability company, was formed in 2004 to acquire certain assets of
New Staff, Inc. Mercer acquired 100% of the common stock of Quantum Resources
Corporation ("Quantum") on July 29, 2005. Effective July 12, 2006, Mercer changed its
name to ClearPoint Business Resources, Inc. and then after the merger (as described
below), changed its name again to ClearPoint Resources, Inc.

3.     On February 12, 2007, CPR merged with a wholly-owned subsidiary of
Terra Nova Acquisition Corporation ("Terra Nova"), whereby as a result of the merger
(the "merger"), stockholders of CPR received 6,051,549 shares of Terra Nova common
stock and CPR became a wholly-owned subsidiary of Terra Nova. A certain percentage
of shares of common stock issued by Terra Nova to CPR's stockholders is being held in
escrow to secure the indemnity rights of Terra Nova under the merger agreement. The
merger agreement also provides for the stockholders to receive additional performance
payments in three separate annual payments based on the share price of Terra Nova's
common stock after the merger. The performance payments are payable in a combination
of cash and shares. No such payments have been made to date and none are yet due.
Upon the closing of the merger, Terra Nova changed its name to ClearPoint Business
Resources, Inc. and its securities became listed on The NASDAQ Capital Market
(symbol: CPBR).

4.     Upon consummation of the merger, $30.6 million was released from a trust fund to be used by the combined company. After payments totaling approximately $3.3 million for professional fees and other direct and indirect costs related to the merger, the net proceeds amounted to $27.3 million. The merger was accounted for under the purchase method of accounting as a reverse acquisition in accordance with accounting principles generally accepted in the United States of America for accounting and financial reporting purposes. Under this method of accounting, Terra Nova was treated as the "acquired" company for financial reporting purposes. In accordance with guidance applicable to these circumstances, this merger was considered to be a capital transaction in substance. Accordingly, for accounting purposes, the merger was treated as the equivalent of CPBR issuing stock for the net monetary assets of Terra Nova, accompanied by a recapitalization. All historical share and per share amounts have been retroactively adjusted to give effect to the reverse acquisition of Terra Nova and related recapitalization.

5.     On February 23, 2007, CPBR acquired certain assets and liabilities of ALS.   The purchase price of $24.4 million consisted of cash of $19 million, a note of $2.5 million at an interest rate of 7% (the "ALS Note), shares of CPBR common stock with a value of $2.5 million (439,367 shares) and the assumption of approximately $400,000 of current liabilities.

6.     Prior to year 2008, ClearPoint provided various temporary staffing services as both a direct provider and as a franchisor. During the year ended December 31, 2008, ClearPoint sold or subcontracted all of its traditional staffing contracts and transitioned its business model from a temporary staffing provider through a network of

branch-based offices or franchises to a provider that managed clients' temporary staffing needs through its open Internet portal-based iLabor network. Under the new business model, ClearPoint acted as a broker for its clients and network of temporary staffing suppliers using iLabor.

7.     On April 26,2010 ClearPoint sold its iLabor Network to MDT Tek, LLC., an entity owned and/or controlled by ClearPoint's former Chief Executive Officer, Michael D. Traina, for a promissory note of $4,850,000, with payments of at least $50,000 per quarter beginning March 15, 2011 ending March 15,2018.

8.     ClearPoint currently derives its revenues from royalty payments related to client contracts which ClearPoint subcontracted or sold to other providers of temporary staffing services. These consist of a perpetual franchise fee calculated at .75% of cash collected related to the sold contracts which averages approximately $30,000 per month and a subcontract fee of $250,000 per month for 28 months which ends on December 31,2010.

## II.     Capital Structure

Secured Debt

9.     On June 20, 2008, ClearPoint entered into a Revolving Credit and Term Loan Agreement (the "Loan Agreement") with ComVest Capital, LLC ("ComVest"). Pursuant to the Loan Agreement, ComVest extended to the Company: (i) a secured revolving credit facility for up to $3 million (the "Revolver") and (ii) a term loan (the "Term Loan" and, together with the Revolver, the "Loans") in the principal amount of $9 million, of which $1 million was treated as an original issue discount, and the Company received $8 million in respect of the Term Loan.

10.     The amounts due under the Revolver bore interest at a rate per annum equal to the greater of: (i) the prime rate of interest announced by Citibank, N.A. plus 2.25% or (ii) 7.25%. The Loans provided that the stated interest rates were subject to increase by 500 basis points during the continuance of an event of default under the Loan Agreement. Amounts due under the Loans were payable monthly, beginning July 1, 2008.

11.     During the quarter ended June 30, 2009, the Company was in default on principal installment payments due for February, 2009 through June, 2009 under the Term Loan in the aggregate amount of $701,822. In addition, the Company was in default on principal installment payments due for July, 2009 under the Term Loan in the aggregate amount of $439,357 and was in default on interest payments due for July, 2009 in the amount of $61,295. The Company was also in default on interest payments due for July, 2009 under the Revolver in the amount of $18,098. The failure to make such payments constituted events of default under the Loan Agreement. The Company was obligated to pay a default interest rate of 500 basis points over the prevailing rate, which difference between the default rate and the prevailing rate was not paid. On May 19, 2009, ComVest executed a waiver letter (the Term Loan Waiver") related to the Loan Agreement for the periods of February through April, 2009. Pursuant to the Term Loan Waiver, ComVest waived the foregoing defaults, provided that ComVest reserved the right to collect at a later time, but no later than the maturity date of the Term Loan under the Loan Agreement, the increased interest ComVest was permitted to charge during the continuance of such defaults. On August 14, 2009, ComVest executed a waiver letter, which waived the Company's defaults under the Loan Agreement through August 14,

2009, provided the Company pays the difference between the increased interest rate charged in connection with the defaults and the regular interest rate no later than March 31, 2010.

12.     On August 14, 2009, the Company entered into the Amended and Restated Revolving Credit Agreement with ComVest (the "Amended Loan Agreement"), which amended and restated the Loan Agreement, dated June 20, 2008. Pursuant to the Amended Loan Agreement, the maximum availability under the secured revolving credit facility (the "Amended Revolver") was increased from $3,000,000 to $10,500,000 million (the "Amended Revolver Maximum"). The remaining outstanding principal balances of $2,900,000 under the revolving credit note and $7,100,000 under the term loan extended by ComVest pursuant to the Original Loan Agreement were paid in full by an advance from the Amended Revolver, and the term note was cancelled.

13.     In connection with the Amended Loan Agreement, each of Messrs. Michael Traina, the Company's then Chairman of the Board of Directors and Chief Executive Officer, and John Phillips, the Company's then Chief Financial Officer, reaffirmed their respective Validity Guaranties previously given to ComVest on June 20, 2008 (the "Validity Guaranty") by executing a Reaffirmation of Validity Guaranties, dated August 14, 2009 (the "Reaffirmation of Validity Guaranties"). The Validity Guaranty provides that each officer will not, intentionally or through conduct constituting gross negligence, and the Company will not, through intentional acts of either Mr. Traina or Mr. Phillips or through conduct constituting gross negligence by each such officer, provide inaccurate or misleading information to ComVest, conceal any information required to be delivered to ComVest or fail to cause the Collateral to be delivered to

ComVest when required or otherwise take any action that constitutes fraud. In the event of a breach or violation of the obligations of Messrs. Traina or Phillips under the Validity Guaranty, the officer must indemnify and hold ComVest harmless from any loss or damage resulting from such breach or violation.

14.     On February 9, 2010, the Company received a notice of default from ComVest in connection with the Amended Loan Agreement. The Company defaulted on its obligations under the Amended Loan Agreement as a result of: (i) its failure to pay approximately $108,000 of accrued interest which was due and payable on February 1, 2010; (ii) its failure to pay a $60,000 installment of a certain modification fee which was due and payable on January 1, 2010; and (iii) the entry of a judgment against the Company related to the lawsuit filed by AICCO, Inc. and delivery of a judgment note in favor of AICCO, Inc. in the amount of approximately $195,330. As a consequence of such defaults, ComVest elected to invoke the default exercise provision under the Amended ComVest Warrant (as defined below). As a result, the Company is obligated to issue to ComVest 18,670,825 shares of common stock, and the Company received approximately $18,671 from ComVest as the exercise price of the Amended ComVest warrant. In connection with this transaction, effective February 16, 2010, ComVest owned 51% of the Company's fully diluted common stock and approximately 56.7% of outstanding shares of our common stock. Pursuant to a letter dated February 10, 2010, ComVest waived existing defaults under the Amended Loan Agreement

a.  Warrant Issued

15.     In connection with June 20, 2008 Revolving Credit and Term Loan Agreement with ComVest, the Company issued a warrant to purchase 2,210,825 shares

of common stock at an exercise price of $0.01 per share, immediately exercisable during the period commencing June 20, 2008 and ending on June 30, 2014. This warrant was valued at $634,000 and treated as a discount to the long term portion of the debt and was amortized over the life of the long term debt. Amortization related to the warrant amounted to $137,792 and $198,000 for the year ended December 31, 2009 and December 31, 2008, respectively. As a result of the August 14, 2009 financing transaction with ComVest described above and in accordance with ASC 470-50-40-17, the unamortized debt discount related to the warrant in the amount of $298,507 was written off as part of the loss on extinguishment of debt. In connection with the August 14, 2009 transaction with ComVest described above, the Company issued to ComVest the Amended and Restated Warrant, dated August 14, 2009 (the "Amended ComVest Warrant"), to purchase, in the aggregate, 2,210,825 shares (the "ComVest Warrant Shares") of the Company's common stock, $0.0001 par value per share (the "Common Stock"), for an exercise price of $0.01 per share (the "ComVest Exercise Price"). Upon the occurrence and during the continuation of an event of default (other than certain specified events of default) under the Amended Loan Agreement, then upon five (5) business days' notice to the Company, the Amended ComVest Warrant is exercisable for a number of shares of Common Stock that, when aggregated with all ComVest Warrant Shares previously acquired upon exercise of the Amended ComVest Warrant, constitutes 51% of the fully diluted Common Stock of the Company at the time of exercise (a "Default Exercise"). The exercise price of the Amended ComVest Warrant for a Default Exercise is $0.001 per share of Common Stock. The exercise price of the Amended ComVest Warrant may be paid to the Company in cash, check or, at ComVest's option,

by crediting the exercise price to any obligation then owed to it under the Amended Loan Agreement. The Amended ComVest Warrant is exercisable until August 31, 2014. The ComVest Exercise Price and the number of ComVest Warrant Shares are subject to adjustment following certain events, including distributions on the Common Stock; merger, consolidation or share exchange; and certain issuances of Common Stock. The Amended ComVest Warrant may be exercised via a "cashless exercise."

16. If at any time the Common Stock is not registered under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or the Company has ceased or suspended the filing of periodic reports under the Exchange Act, ComVest has the right to require the Company to redeem and purchase from ComVest, for a cash purchase price of $2.0 million, 50% of the Amended ComVest Warrant, or the equivalent of 50% of the ComVest Warrant Shares that may be, or have been, issued upon exercise of the Amended ComVest Warrant: (i) if the Company or any of its stockholders enters into a binding agreement with respect to any sale (as defined in the Amended Loan Agreement); (ii) upon and after the occurrence and during the continuance of an event of default under the Amended Loan Agreement; or (iii) any other event or circumstance that causes, effects, or requires any payment in full under the Amended Loan Agreement.

17. If there is a proposed sale of a majority of the outstanding shares of Common Stock of the Company, on an as-converted basis, ComVest has the right, exercisable upon written notice to the selling stockholder(s) provided not less than ten (10) days prior to the proposed date for consummation of the sale, to elect to participate in the transaction and sell to the proposed purchaser(s) a portion of the ComVest Warrant

Shares equal, on a percentage basis, to the percentage of the selling stockholder(s)' Common Stock included in the proposed transaction.

18.     As a result of the new contingent put feature included in the Amended ComVest Warrant, the Company determined that the warrant no longer met equity classification treatment. As a result, the Company estimated the fair value of the warrant as of August 14, 2009 using the Black Scholes option pricing model, which was determined to be $88,431, and recorded a reclassification adjustment to reduce additional paid-in capital by $88,431 and increase the warrant liability by $88,431. As of December 31, 2009, the estimated fair value of the warrant liability was determined to be $185,452. The Company also used the default number of shares to be issued upon warrant exercise and the default exercise price in valuing the warrant as of December 31, 2009 as management had determined that the Company would be in default of the Amended Loan Agreement with ComVest in the first quarter of fiscal 2010 because it would not be able to make its required principal and interest payments under the Amended Loan Agreement. For the year ended December 31, 2009, the Company recorded a $97,021 mark to market loss on derivative instruments related to this warrant in the Consolidated Statement of Operations.

19.     As discussed above, on February 9, 2010, ComVest invoked the Default Exercise provision of the Amended ComVest Warrant.

20.     As of the Petition Date, ClearPoint's total outstanding balance on the ComVest debt is not less than $12,655,196, including, without limitation, principal in the amount of approximately $11,041,049, interest in the amount of $1,614,147, plus all

costs, expenses, fees (including attorneys' fees and legal expenses) and other charges (collectively, the "Prepetition Obligations").

Recent Financial Information

21.    As of May 31, 2010, the Debtors had consolidated assets totaling approximately $5.5 million (net of allowance for doubtful accounts) and consolidated liabilities totaling approximately $24.5 million.  The Debtors' consolidated revenues for its fiscal year ended December 31, 2009 and 2008 were $5.2 million and $33.5 million, respectively.

**III.    Factors Leading to Chapter 11 Filing**

22.    Due to a change in business environments, the Debtors entered into several agreements to transfer their business operations to several third parties.  In exchange, the Debtors received royalty agreements, payment obligations and other contract rights (collectively, the "Contract Rights").  The revenue ClearPoint receives from the Contract rights is not sufficient to meet its obligations.

23.    ClearPoint's Board of Directors has considered the available alternatives, consulting with its advisors and has negotiated with ComVest.  As a result, it has determined that the best course of action for ClearPoint and its creditors and interest holders is for ClearPoint to voluntarily commence the instant chapter 11 Bankruptcy proceedings.  Substantially contemporaneous with the commencement of the cases, the Debtors will move the Court for an Order authorizing it to conduct a sale of the Contract Rights.

## IV.     The First Day Pleadings

24.     Concurrently with the filing of their Chapter 11 petitions, the Debtors have filed the First Day Pleadings listed on **Exhibit A**.  I submit this Declaration in support of the First Day Pleadings.  I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct.   Such representation is based upon information and belief, through my review of various materials and other information, and my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

25.     As a result of my first-hand experience, and through my review of various materials and other information, discussions with the other Debtors' executives, and discussions with outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought in the First Day Pleadings, (b) the importance of the relief sought in the First Day Pleadings for the Debtors to continue to operate effectively; and (c) the negative impact upon the Debtors of not obtaining the relief sought in the First Day Pleadings.

26.     I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate as debtors-in-possession. A description of the relief requested and the facts supporting each of the First Day Pleadings is set forth below.

## MOTION OF DEBTORS FOR JOINT ADMINISTRATION
## OF CHAPTER 11 CASES

27.     In this case, CPR is wholly-owned subsidiaries of CPBR. The Debtors

believe it would be more efficient for these cases to be jointly administered for

procedural purposes. The Debtors believe that most hearings and contested matters will

apply to all of the Debtors' cases equally. Joint administration of these cases will obviate

the need for duplicative notices, motions, applications, hearings, and orders, and will

therefore save considerable time and expense for the Debtors and their estates.

Consequently, joint administration of these cases will promote the economical and

efficient administration of the Debtors' estates, unencumbered by the procedural

problems otherwise attendant to the administration of separate, albeit related, cases.

## APPLICATION UNDER 11 U.S.C. §§ 327(A) AND 1107(B), FED. R. BANKR. P.
## 2014 & 2016, AND BANKR. D. DEL. L.R. 2014-1 & 2016-1 TO APPROVE THE
## EMPLOYMENT AND RETENTION OF GERSTEN SAVAGE, LLP AS
## ATTORNEYS FOR THE DEBTORS

28.     The Debtors are seeking approval of the employment and retention of

Gersten Savage LLP ("Gersten Savage") as their attorneys in the Chapter 11 cases,

effective as of the Petition Date.

29.     The Debtors are seeking to retain Gersten Savage for, in addition to others,

the following reasons:

> a.  Gersten Savage has extensive experience and knowledge in the field of
>     debtors' and creditors' rights and business reorganizations under Chapter
>     11 of the Bankruptcy Code. Gersten Savage has expertise, experience,
>     and knowledge practicing before bankruptcy courts in this and other
>     districts throughout the country. Gersten Savage's appearance before the
>     Court for the matters in the Chapter 11 cases will be efficient and cost
>     effective for the Debtors' estates.
>
> b.  Gersten Savage is a full-service law firm with experience and expertise in
>     all other legal areas that will have an impact on the Debtors' day-to-day

operations and their reorganization under Chapter 11 of the Bankruptcy Code.

30.     The Debtors contemplate that Gersten Savage will render specialized legal services to the Debtors as needed throughout the Chapter 11 cases. Generally, the legal services that Gersten Savage will render may be summarized, in part, as follows:

a.  Advising the Debtors of their rights, powers and duties as debtors-in-possession under the Bankruptcy Code;

b.  Performing all legal services for and on behalf of the Debtors that may be necessary or appropriate in the administration of these bankruptcy cases and the Debtors' businesses;

c.  Advising the Debtors concerning, and assisting in, the negotiation and documentation of financing agreements and debt restructurings;

d.  Counseling the Debtors in connection with the formulation, negotiation, and consummation of a possible sale of the Debtors' or their assets;

e.  Reviewing the nature and validity of agreements relating to the Debtors' interests in real and personal property and advising the Debtors of their corresponding rights and obligations;

f.  Advising the Debtors concerning preference, avoidance, recovery, or other actions that they may take to collect and to recover property for the benefit of the estates and their creditors, whether or not arising under Chapter 5 of the Bankruptcy Code;

g.  Preparing on behalf of the Debtors all necessary and appropriate applications, motions, pleadings, draft orders, notices, schedules, and other documents and reviewing all financial and other reports to be filed in these bankruptcy cases;

h.  Advising the Debtors concerning, and preparing responses to, applications, motions, complaints, pleadings, notices, and other papers that may be filed and served in these bankruptcy cases;

i.  Counseling the Debtors in connection with the formulation, negotiation, and promulgation of a plan of reorganization and related documents or other liquidation of the estates;

j.  Working with and coordinating efforts among other professionals to attempt to preclude any duplication of effort among those professionals

and to guide their efforts in the overall framework of Debtors' reorganization or liquidation; and

k. Working with professionals retained by other parties in interest in this bankruptcy case to attempt to structure a consensual plan of reorganization, liquidation, or other resolution of the bankruptcy cases for Debtors.

31. The nonexclusive services described above are essential to the Debtors' successful reorganization.

32. Gersten Savage was engaged by ClearPoint on May 7, 2010 to provide advice concerning financial restructuring, pre-bankruptcy and bankruptcy planning.

33. Gersten Savage has expended significant resources over the past few months working with ClearPoint to prepare for the filing of these cases. Over the last few months, Gersten Savage has become intimately familiar with ClearPoint's business operations and financial affairs and many of the legal issues that will likely arise in the context of these Chapter 11 cases. If ClearPoint is forced to retain counsel other than Gersten Savage, the Debtors' estates would incur additional expenses and delays associated with familiarizing new counsel with the intricacies of ClearPoint's financial affairs and business.

34. To the best of ClearPoint's knowledge, information and belief, and except as set forth on Schedule A annexed to the Declaration of Paul Rachmuth attached to the motion as Exhibit A, Gersten Savage has no connection with ClearPoint's creditors, parties in interest or affiliates, or attorneys or accountants for any of them, the United States Trustee, or any person employed in the Office of the United States Trustee.

35. To the best of ClearPoint's knowledge based upon the Rachmuth Declaration, Gersten Savage does not represent or hold any interest adverse to the Debtors, their estates, creditors, equity security holders, or affiliates in the matters upon

which Gersten Savage is to be engaged, and is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and as required by section 327(a) of the Bankruptcy Code.

## MOTION OF DEBTORS FOR ORDER (I) AUTHORIZING CONTINUED USE OF EXISTING BUSINESS FORMS AND RECORDS; (II) AUTHORIZING MAINTENANCE OF EXISTING CORPORATE BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM; (III) WAIVING (IF NECESSARY) THE REQUIREMENTS OF 11 U.S.C. § 345(B) AND (IV) GRANTING RELATED RELIEF

36.     Prior to commencing these cases, in the ordinary course of business, the Debtors used a cash management system (the "Cash Management System") to efficiently collect, transfer, and disburse funds generated by their business operations.

37.     Revenues generated by the receipt of staffing fees from clients are deposited into a lockbox account ("Lockbox") controlled by ComVest. ComVest disburses these funds to the Debtors for their operations and use on an as-needed basis, but at least weekly. Funds are transferred by ComVest by wire from the Lockbox to one or both of ClearPoint's operating bank accounts, which the Debtors use to conduct all of their cash-based operations in the regular course of business, including paying all cash liabilities, which include but are not limited to disbursements for operating expense, general and administrative expense, and restructuring expenses.

38.    The Debtors' operating account is held at Wachovia Bank ("Wachovia").
The following details ClearPoint's primary bank account with Wachovia (the "Wachovia
Operating Account"):

|             |                            |
|-------------|----------------------------|
| Bank:       | Wachovia Bank              |
| Address:    | P.O. Box 563966            |
|             | Charlotte, NC  28256       |
| Account name: | ClearPoint Resources, Inc. |
| Account #:  | 2000037667155              |
| Approximate Balance | $2,000             |

39.    The Debtors also have a money market account at Wachovia (the
"Wachovia Money Market Account"):

|             |                            |
|-------------|----------------------------|
| Bank:       | Wachovia Bank              |
| Address:    | P.O. Box 563966            |
|             | Charlotte, NC  28256       |
| Account name: | ClearPoint Resources, Inc. |
| Account #:  | 2000037667281              |
| Approximate Balance | $200               |

40.    The Debtors also maintain a bank account at Team Capital Bank ("Team
Capital") solely for the purpose of holding a $25,000 certificate of deposit that acts as
collateral for an insurance policy (the "Team Capital Account" and together with the
Wachovia Operating Account and Wachovia Money Market Account, the "Bank
Accounts"):

| Bank: | Team Capital Bank |
|---|---|
| Address: | 2151 Emrick Blvd. |
| | Bethlehem, PA 18020 |
| Account name: | ClearPoint Resources, Inc. |
| Account #: | 30089056 |
| Approximate Balance | $25,500 |

41.    The Debtors are requesting the entry of an order, among other things, authorizing the Debtors to continue using their existing business forms and records and authorizing the Debtors to maintain their bank accounts and Cash Management System.

42.    The Debtors are also requesting the entry of an order waiving the requirements of 11 U.S.C. § 345(b) and granting related relief. The Office of the United States Trustee's Operating Guidelines for Chapter 11 Cases (the "Guidelines") require Chapter 11 debtors-in-possession to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation, "debtor-in-possession." The Guidelines also require debtors to close their books and records as of the petition date and to open new books and records. The Guidelines are designed to provide, among other things, a clear demarcation between prepetition and postpetition transactions and operations, which would, in theory, prevent the inadvertent postpetition payment of a prepetition claim.

43.    The Debtors are seeking a waiver of certain of the Guidelines. The Debtors' operations would be harmed by the disruption, confusion, delay, and cost that would most certainly result from rigid compliance with the Guidelines. The Debtors are

seeking a waiver of the Guidelines' requirement that they open a new set of books and records as of the Petition Date. Opening a new set of books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay. In the ordinary course of their business, the Debtors use many invoices, stationery, and other business forms. By virtue of the nature and scope of the Debtors' business and the numerous parties with whom they deal, the Debtors need to use their existing business forms without alteration or change. Printing new business forms would take an undue amount of time and expense. Fulfillment of the requirement would likely delay the payment of postpetition claims and negatively impact operations and the value of these estates. Accordingly, the Debtors are requesting that they be authorized to continue to use their existing business forms and to maintain their existing business records.

44. The Debtors are requesting authority to maintain the Bank Accounts and the Cash Management System in accordance with their usual and customary practices to ensure a smooth transition into Chapter 11 with minimal disruption to operations. The Debtors are also requesting authority to close any of the Bank Accounts if, in the exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates.

45. In order to conduct their postpetition business, the Debtors need to be able to issue checks to vendors, service providers, employees, and others. To open new accounts and obtain checks for those accounts will cause delay and disruption to the Debtors' business and a delay in receipt of funds needed for the Debtors' operations.

46.     The Debtors' Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtors including, among other things, the ability to (i) control funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.  Any disruption of the Cash Management System could have a severe and adverse impact upon the Debtors' reorganization efforts.

47.     The relief requested in the motion is vital to ensuring the Debtors' seamless transition into bankruptcy.  Authorizing the Debtors to maintain their Cash Management System, as modified, will avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of these Chapter 11 cases.

48.     Pursuant to § 105(a) of the Bankruptcy Code, the Debtors are seeking a waiver of the requirements of § 345(b) of the Bankruptcy Code.  The Bank Accounts are maintained with a financial institution that is financially stable.  The Debtors believe that their banks are authorized depositories in this and other jurisdictions.  Out of an abundance of caution, however, the Debtors request a waiver of the requirement to comply with § 345(b)'s investment guidelines, if necessary, as their deposits in the Bank Accounts should not pose a substantial risk to the Debtors' estates or creditors.

49.     Requiring the Debtors to change their deposits and other procedures could result in harm to the Debtors, their estates, and creditors because such change would disrupt the Cash Management System.  Conversely, the Debtors' estates and creditors

will not be harmed by the Debtors' maintenance of the status quo because of the safe and prudent practices already utilized by the Debtors.

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. § 341 AND 28 U.S.C. § 156(C) AUTHORIZING THE DEBTORS TO (I) FILE (A) CONSOLIDATED LIST OF CREDITORS AND (B) CONSOLIDATED LIST OF DEBTORS' TOP TWENTY CREDITORS AND (II) PROVIDE NOTICES, INCLUDING NOTICES OF COMMENCEMENT OF CASES AND SECTION 341 MEETING**

50.     The Debtors have identified thousands of entities to which notice of certain proceedings in the Chapter 11 Cases must be provided. The Debtors anticipate that such notices may comprise, without limitation, notice of: (a) the filing of the Debtors' voluntary petitions under chapter 11 of the Bankruptcy Code, (b) the initial meeting of the Debtors' creditors in accordance with section 341 of the Bankruptcy Code, (c) applicable bar dates for the filing of claims, (d) the hearing on the sale of some or all of the Debtors' business or assets; (e) the hearing on adequacy of a disclosure statement in respect of a plan of reorganization or liquidation, and (f) the hearing to confirm a plan of reorganization or liquidation (collectively, the "Notices").

51.     The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the Notices and other documents in the Chapter 11 Cases. The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the Notices and other similar documents, as contemplated by Local Rule 1007-2. Accordingly, by this motion, the Debtors seek authority to file the lists on a consolidated basis, identifying their creditors and equity security holders in the format or formats currently maintained in the ordinary course of the Debtors' businesses.

52.     The Debtors submit that a single consolidated list of their combined twenty (20) largest unsecured creditors in these cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors. Therefore, the Debtors respectfully request authorization to file a single consolidated list of their twenty (20) largest unsecured creditors in these cases (the "Consolidated Top 20 List").

53.     The Debtors believe that such relief is not only appropriate under the circumstances, but necessary for the efficient and orderly administration of these cases.

54.     In lieu of effecting service through the Office of the Clerk of this Court, the Debtors also request that they (or their agents) be approved and authorized to complete all mailings to creditors and equity holders in these cases, including notice of the commencement of these cases and notice of the meeting of creditors pursuant to section 341 of the Bankruptcy Code.

55.     Allowing the Debtors (or their agents) to complete their own mailings will save significant time, cost and expense.

## DEBTORS APPLICATION FOR AN INTERIM ORDER: (I) AUTHORIZING USE OF CASH COLLATERAL; (II) GRANTING THE PREPETITION LENDER ADEQUATE PROTECTION; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF

56.     By this motion, the Debtors seek for entry of an interim consent order (the "Interim Order"), substantially in the form annexed hereto as Exhibit "A", (I) authorizing use of cash collateral; (II) granting the prepetition lender, ComVest Capital, LLC (the "Prepetition Lender" or "ComVest") adequate protection; (III) scheduling a final hearing (the "Final Hearing"); and (IV) granting related relief.

57.     The Debtors have determined, in the exercise of their business judgment

and with the advice of their counsel, that it is in their estates' best interest that their collateral be used to preserve the value of the estates. As explained above, all of the Debtors' available cash is subject to the prepetition liens of the Prepetition Lender and, therefore, constitutes cash collateral. Accordingly, the Debtors require the consent of the Prepetition Lender (or an order of the Bankruptcy Court over the Prepetition Lender's objection) to use cash collateral; which consent would not be forthcoming absent the provisions contained in the proposed Interim Order.

58. The Prepetition Lenders have consented to the Debtors' use of Cash Collateral under the terms and conditions of the proposed Interim Order. Thus, the Debtors' use of Cash Collateral is within Bankruptcy Code Section 363(c)(2)(A). Absent the use of Cash Collateral, the Debtors would be unable to preserve the value of the Prepetition Lender's collateral. The Prepetition Lender will be adequately protected pursuant to the terms set forth in the proposed Interim Order. Accordingly, the Debtors have satisfied the requirements under Section 363(c)(2)(A) and the use of Cash Collateral should be approved.

## CONCLUSION

For the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each of the First Day Pleadings be granted in its entirety, together with such further relief as the Court deems just and proper.

[Signature Page Follows]

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on June 23, 2010.

Christine Doelp
President and Secretary
ClearPoint Business Resources, Inc.
ClearPoint Resources, Inc.

## Exhibit A

1.  Motion Of Debtors For Joint Administration Of Chapter 11 Cases

2.  Application Under 11 U.S.C. §§ 327(A) And 1107(B), Fed. R. Bankr. P. 2014 & 2016, And Bankr. D. Del. L.R. 2014-1 & 2016-1 To Approve The Employment And Retention Of Gersten Savage, LLP As Attorneys For The Debtors

3.  Motion Of Debtors For Order (I) Authorizing Continued Use Of Existing Business Forms And Records; (II) Authorizing Maintenance Of Existing Corporate Bank Accounts And Cash Management System; (III) Waiving (If Necessary) The Requirements Of 11 U.S.C. § 345(B) And (IV) Granting Related Relief

4.  Motion Of Debtors For Entry Of An Order Pursuant To 11 U.S.C. § 341 And 28 U.S.C. § 156(C) Authorizing The Debtors To (I) File (A) Consolidated List Of Creditors And (B) Consolidated List Of Debtors' Top Twenty Creditors And (II) Provide Notices, Including Notices Of Commencement Of Cases And Section 341 Meeting

5.  Application For Entry Of An Interim Consent Order (I) Authorizing Use Of Cash Collateral; (II) Granting Prepetition Lender Adequate Protection; (III) Scheduling A Final Hearing; and (IV) Granting Related Relief