# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CLEARPOINT BUSINESS RESOURCES, | ) | Case No. 10-12037(KG) |
| INC., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Re: Dkt No. 133** |
| _____ | ) | |

## MEMORANDUM OPINION[1]

The Debtors, ClearPoint Business Resources, Inc. and ClearPoint Resources, Inc. ("Debtors"), seek to enjoin an alleged violation of the automatic stay by StaffChex, Inc. ("StaffChex"). Debtors invoke 11 U.S.C. §§ 105, 362 and 541 to halt StaffChex's claim that pre-petition agreements between Debtors and StaffChex terminated by their own terms and therefore the automatic stay is not implicated.

The Court conducted an evidentiary hearing on November 16, 2010. See Transcript of Hearing ("Tr. ___"). The Court finds in favor of StaffChex for the reasons which follow.

## JURISDICTION

The Court has jurisdiction over the disputed matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this district is proper in accordance with 28 U.S.C. §§ 1408 and 1409.

---

[1] This Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

**UNDISPUTED FACTS**

The Debtors operated an employment staffing business and contracted with companies that employed temporary workers (the "Staffing Contracts"). Debtors employed the temporary workers who then worked for Debtors' clients. The clients, in turn, paid Debtors.

The Debtors also developed a web-based application named the "iLabor Network" ("iLabor"). The concept of iLabor is that companies needing temporary staffing post work orders on a website and staffing companies then fill the work orders. Debtors collect a fee for the transaction equal to the difference between the worker bill rate and the supplier bill rate, approximately four percent.

In February 2008, Debtors and StaffChex agreed on an asset purchase agreement (the "APA") and the iLabor Network Supplier Agreement (the "iLabor Agreement") (collectively, "the Agreements"). Debtors transferred specified customer staffing agreements to StaffChex and agreed to provide StaffChex with access to iLabor. As consideration, StaffChex agreed to place work on iLabor and pay Debtors a percentage of its gross receipts including non-iLabor receipts (the "Percentage Payments")[2]. StaffChex also granted Debtors 18,607 shares of its common stock (the "StaffChex Shares").

StaffChex was $587,444 in arrears by March 2009, on its Percentage Payments obligation. The parties then amended the Agreements and provided for adjustments to the Percentage Payments based on weekly rather than annual receipts.

---

[2] The percentage payments were gross receipts based: 2.25% up to $110 million/year; 1.50% for the next $50 million; and 1.25% in excess of $150 million.

In November, 2009, Debtors and StaffChex amended the Agreements for a second time (the "Second Amendment"). StaffChex at the time was $560,000 in arrears. The Second Amendment again adjusted the Percentage Payments, and addressed other provisions. Debtors also relinquished 12,405 shares to StaffChex and granted StaffChex an option to repurchase 18, 607 Shares for a price of $250,000, with an exercise date of not later than November 18, 2011.

In April 2010, Debtors sold iLabor to MDT Tek, Inc. ("MDT"), which Debtors' former Chief Executive Officer, Michael Traina, formed to operate iLabor.

## DISCUSSION

### A. The Dispute

StaffChex's business relationship with Debtors was disastrous. Tr. 37-38 (Garza). StaffChex attempted to save its business through the amendments to the Agreements, but remains in peril. Tr. 90 (Garza).

In early July 2010, StaffChex claimed that Debtors had fundamentally breached the Agreements by transferring iLabor to MDT. Thereafter, in September 2010, StaffChex wrote to Debtors and claimed that the Agreements had terminated by their terms because StaffChex met the target of the iLabor Agreement for the required six consecutive weeks. Debtors insist that StaffChex did not meet the requirements for termination because StaffChex did not transfer the customer accounts.

**B. The Understandings**

Debtors seek an Order enforcing the automatic stay, 11 U.S.C. § 362(a), enjoining StaffChex's termination of the Agreements and directing StaffChex to perform its obligations. The parties amended the Agreements several times because StaffChex was unable to meet its obligations. StaffChex claims the Agreements, as amended, terminated based on the Second Amendment and on a purported oral modification of the iLabor Agreement.

StaffChex's arguments in support of termination are as follows:

1. The Second Amendment provides, in pertinent part, that:

> Upon the date on which the billings from the Transferred Accounts and additional transferred accounts meet or exceed a total of $307,682 per week for six (6) consecutive weeks, ClearPoint shall immediately pay a success fee in the form of an immediate transfer and assignment of all Eighteen Thousand Six Hundred and Seven (16,607) shares of stock of StaffChex (the "Success Fee") and this Agreement shall automatically terminate and be of no further force and effect without any further action by the parties hereto; provided however that all provisions with respect to the payment of the Prior Compensation and any Deferred Amount shall survive the termination of this Agreement without reduction until paid in full in accordance with the terms hereof.

StaffChex claims, and the evidence establishes, that it made the required payments to achieve termination.[3]

---

[3] The Second Amendment makes it clear that termination does not eliminate StaffChex's obligations. StaffChex's payment obligations survive termination.

4

  2. After the Second Amendment, Debtors and StaffChex orally modified the iLabor Agreement (the "Oral Amendment") so that (a) StaffChex would not be required to transfer customer contracts to Debtors but would continue to utilize iLabor, (b) StaffChex would pay Debtors at least $2,885 per week related to the Transferred Accounts; and (c) Debtors would not compensate StaffChex for staffing projects StaffChex filled.

  The Agreements provide that Pennsylvania law governs. The parties agree that Pennsylvania law provides that parties to a contract may orally modify its terms even if the contract requires modifications to be in writing. *Somerset Cmty. Hosp. v. Allen B. Mitchell & Assoc., Inc.*, 685 A.2d 141, 146 (Pa.Super.Ct. 1996); *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 244 A.2d 10 (1968). Oral amendments may be established by words or conduct. *First Nat'l Bank of Pa. v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 280 (3d Cir. 1987). Ultimately courts look to the parties' conduct to determine the existence of an oral modification and require clear and convincing evidence. *Somerset*, 685 A.2d at 146. The evidence of the Debtors' and StaffChex's conduct shows clearly and convincingly that the parties orally modified the Agreements.

  First, the Debtors and StaffChex met with customers of the Transferred Accounts who had concerns about the transfers. Debtors and StaffChex therefore decided it was in their interest not to insist on the actual transfers but, rather, only to utilize iLabor. Tr. 88-90 (Garza).

Second, StaffChex's lender would not factor the Transferred Accounts which created a cash flow emergency for StaffChex. Debtors and StaffChex attempted to remedy the problem through a Disbursement Agreement, dated January 19, 2010. The Debtors thereby transferred the Transferred Accounts back to StaffChex and also agreed that further transfer of customer accounts was not required. StaffChex points to the fact that following the Disbursement Agreement, Debtors never asked StaffChex to transfer accounts and did not claim StaffChex breached the iLabor Agreement. Tr. 98 (Garza).

Third, StaffChex agreed it would not receive payment for filling jobs on iLabor. StaffChex also agreed to pay Debtors $2,885 per week. Tr. 124 (Traina).

The foregoing facts are clear and convincing proof of the existence of the Oral Amendment. Coupled with StaffChex's billings of $307,682 for six consecutive weeks through iLabor, StaffChex met the requirements for termination.

There was a clear acknowledgment of receipt of the termination payments. StaffChex wrote to Michael Traina of MDT by email, dated September 14, 2010 (Dx J) that StaffChex fulfilled

> its obligations under the iLabor Agreement by providing billings from the Transferred Accounts and additional transferred accounts which meet or exceed a total of $307,682 per week for six (6) consecutive weeks in the following manner:
>
> 1. Week of August 1, 2010, billings - $357,917.12
> 2. Week of August 8, 2010, billings - $389,400.88
> 3. Week of August 15, 2010, billings - $403,959.01
> 4. Week of August 22, 2010, billings - $416,987.63
> 5. Week of August 29, 2010, billings - $464,568.82
> 6. Week of September 5, 2010, billing $446,360.96

6

        a.       StaffChex's CEO testified that StaffChex ran the required $307,682 per week through iLabor. Tr. 60-61 (Garza). Email correspondence confirms the billings. Dx. J. Debtors did not rebut the testimony that established that StaffChex met its target.

        b.       The e-mail messages that StaffChex and MDT exchanged confirmed the payment and by email, dated September 14, 2010, MDT acknowledged receiving the payments.

Debtors attempt to negate the significance of StaffChex's payments as a termination event. Debtors claim that despite the termination qualifying payments, StaffChex failed to transfer the customer accounts to Debtors. Debtors' argument misses the point that the Oral Amendment eliminated the requirement that StaffChex transfer the Transferred Accounts. The Oral Amendment reflected the practical reality that the existing circumstances made the transfer of customer accounts a useless act. Debtors no longer operate their business and, therefore, the transfer of client accounts would not make sense.

Michael Traina confirmed StaffChex's claim of termination in his testimony. Tr. 121-122.

> Q. After the date of the disbursement agreement, January 2010, did ClearPoint accept that StaffChex would not transfer clients?
> A. I don't think the characterization is that simple, but by definition, yes.
> Q. Did Clearpoint ever send StaffChex a notice of default or breach or otherwise inform StaffChex that it was in default or breach of the iLabor agreement?
> A. I don't remember.
> Q. Just to clarify, the breach would have been because they didn't transfer accounts and this would be after January 2010. So I'll narrow the time frame for you.
> A. There was never a transferred account breach that I'm aware of. Or transferred account breach that I'm aware of that we notified them of.

Q. Did ClearPoint inform StaffChex, again, after January 2010, that StaffChex could no longer meet and exercise the termination provision of the second amendment?
A. No.

### C. No Stay Violation

The Court has now found that the Agreements terminated by their terms during the course of the Debtors' bankruptcy. StaffChex did not, therefore, violate the automatic stay. A Chapter 11 filing does not expand a debtor's rights. *In re PSA, Inc.*, 335 B.R. 580, 588 (Bankr. D. Del. 2005). Once a contract ends, a debtor's rights, such as to assume, ends as well. *Counties Contracting and Const. Co. v. Constitution Life Ins. Co.*, 855 F.2d 1054, 1061 (3d. Cir. 1988).

### CONCLUSION

The Court concludes that the Agreements, as amended, between Debtors and StaffChex terminated by their terms. Accordingly, StaffChex did not violate the automatic stay.

Dated: December 30, 2010

KEVIN GROSS, U.S.B.J.

8